**Lucille M. COUTURE et al.**

v.

**PAWTUCKET CREDIT UNION.**

**No. 99–400–Appeal.**

Supreme Court of Rhode Island.

Jan. 29, 2001.

Weisberger, C.J., concurred in part, dissented in part, and filed opinion in which Bourcier, J., joined.

Joseph P. Carroll, for Plaintiff.

Matthew T. Oliverio, John T. Gannon, Pawtucket, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

Does a creditor's contractual right to apply deposited funds against a debt owed to it survive the debtor's bankruptcy? More particularly, under an agreement with its account holders, can a bank apply the funds deposited in the holders' joint accounts against the balance due on a holder's defaulted mortgage loan, notwithstanding the discharge of the holder's mortgage debt in bankruptcy? For the reasons set off below, we answer these questions in the affirmative.

### Facts and Travel

On November 15, 1986, Donald E. Couture (debtor), and Madeline C. Girard executed a promissory note and mortgage in the principal amount of $150,000 (mortgage loan). Thereafter, the creditor, defendant Pawtucket Credit Union (PCU or bank), acquired this mortgage loan. As of March 27, 1995, debtor and his parents, Lucille and Normand Couture (collectively, the Coutures) were joint-account holders on four time-deposit accounts (accounts) at PCU. The debtor's parents knew that their son was indebted to PCU through the note and mortgage when they added his name to the accounts on that date. By signing the signature cards for each of the four accounts, each account holder agreed to PCU's Rules and Regulations governing the accounts, including a clause that said "[PCU] may, at its discretion, apply any or all of the funds represented by the certificate against any indebtedness in default which may be owing to it by the [account] holder as an offset against such debt." (The setoff clause.)

In March 1996, debtor defaulted on the mortgage loan, prompting PCU, in May 1996, to send debtor a written notice of default. Receiving no response, it then placed an administrative freeze on the accounts, but it did not yet exercise its right of setoff. Thereafter, on November 6, 1996, PCU received a notice that debtor had filed for bankruptcy. Although PCU

maintained the administrative freeze on the accounts during the pendency of the bankruptcy, it never applied to the bankruptcy court for permission to set off the funds in the accounts against the balance due on the defaulted mortgage loan. Moreover, debtor never listed the accounts as assets of his estate in the bankruptcy proceeding. The bankruptcy court, however, in response to PCU's request, allowed it to foreclose on the defaulted mortgage loan.

On February 6, 1997, the bankruptcy court entered a notice of discharge in the debtor's bankruptcy proceeding, thereby relieving debtor of any personal liability on the mortgage loan. A month later, PCU completed a foreclosure sale with respect to the property securing debtor's mortgage loan. After applying the sale proceeds to the loan balance, PCU determined that the foreclosure sale resulted in a deficiency, leaving an unpaid mortgage-loan balance that exceeded the amount of funds held in the accounts. On March 10, 1997, PCU notified debtor's bankruptcy trustee that it would be setting off the funds in the accounts against the unpaid balance due on the mortgage loan. The trustee neither responded to PCU's letter nor expressed any interest in reopening the bankruptcy proceeding to adjudicate the validity of PCU's interest with respect to the accounts. On June 10, 1997, invoking its authority under the setoff clause, PCU applied the funds in the accounts against the deficiency owing on the debtor's mortgage loan. Thereafter, the Coutures filed suit, contending that the bank was not entitled to set off the funds in the accounts against the discharged mortgage debt. In due course, the Superior Court denied PCU's motion for summary judgment and granted the Coutures' motion for summary judgment. After entry of final judgment, PCU appealed to this Court.

Did PCU possess the right to set off the mortgage-loan deficiency against the funds held in the accounts after the bankruptcy court had discharged debtor from his debts? The Coutures contend that PCU had no authority to do so because on February 6, 1997, the bankruptcy court had discharged the underlying mortgage-loan debt. They argue that, pursuant to the language of the setoff clause, a debt must be "owing" at the time the bank applies the funds of the accounts as an offset against such debt. Here, they contend, the bankruptcy court already had discharged the mortgage-loan debt when PCU attempted to exercise its right of setoff. PCU, however, counters that it was entitled to exercise its contractual right of setoff against the accounts because, as a matter of law, its setoff right survived the debtor's bankruptcy.

For the reasons explained below, we agree with PCU and hold that PCU's setoff right survived debtor's bankruptcy. Because "a bankruptcy discharge extinguishes only one mode of enforcing a claim namely, an action against the debtor in personam," *Johnson v. Home State Bank,* 501 U.S. 78, 84, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66, 75 (1991), it leaves intact other modes of enforcement, including, without limitation, an action against the debtor *in rem, id.,* as well as a creditor's pre-bankruptcy right to set off deposited funds against a mature debt owing to the creditor. *See, e.g., In re Wiegand,* 199 B.R. 639, 641–42 (W.D.Mich.1996) (holding that the purpose of a bankruptcy discharge was not disserved by allowing a creditor to offset a debt that was discharged in bankruptcy). Here, we hold, PCU's setoff mode for enforcing its claim against debtor for the unpaid balance due on the mortgage loan remained intact to the extent of the funds deposited in the accounts, notwithstanding the discharge in bankruptcy of the underlying mortgage debt.

### Analysis

### I

### Validity of Setoff Right

The United States Bankruptcy Code (code) does not create a right of

setoff; rather, it is a creature of either state or federal non-bankruptcy law. *See Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 18, 116 S.Ct. 286, 289, 133 L.Ed.2d 258, 262 (1995). Therefore, before we consider whether PCU's right to set off its deficiency claim against the funds in the Coutures' accounts survived the debtor's bankruptcy, we first must determine whether PCU possessed such a right as a matter of non-bankruptcy law.

■■ In Rhode Island, the "rights and obligations of a bank and its depositors in regard to funds on deposit are governed by the terms of the contract entered into at the time the relationship is established." *Paradis v. Greater Providence Deposit Corp.,* 651 A.2d 738, 740 (R.I.1994). Moreover, the general non-bankruptcy rule in this jurisdiction is that "a bank is entitled to a setoff for repayment of a *matured* debt owed by a depositor." *Brill v. Citizens Trust Co.,* 492 A.2d 1215, 1216 (R.I. 1985). Thus, in *Paradis,* we held that "when the joint depositors accepted and retained a passbook containing rules and regulations, such rules and regulations constituted the depositors' contract with the bank." 651 A.2d at 740. Here, when the Coutures signed the signature cards for each of the accounts, they accepted the rules and regulations of the accounts printed on the last page of each passbook they retained and were thereby contractually bound to these terms. Pursuant to this contract, PCU had the right to "apply any or all of the funds represented by the certificate against any indebtedness in default which may be owing to it by the [account] holder as an offset against such debt." Therefore in March 1996, when debtor defaulted on his mortgage, PCU had a contractual right to set off the "indebtedness in default" against the funds deposited in the accounts.

We recognize that some depositors open joint bank accounts for estate planning or convenience purposes and that in doing so they may expose themselves unwittingly to the type of setoff liability that the Cou-

tures assumed in this case. As the dissent notes, in certain circumstances the enforceability of such a provision may be subject to various equitable defenses, including the doctrine of unconscionability—especially if the depositors' agreement can be characterized as an adhesion contract.

■ But in this case the Coutures have failed to challenge the setoff clause on these equitable grounds at any point in these proceedings. Most tellingly, they failed to raise any adhesion-contract issues in any of their pleadings, in their response to the summary-judgment motion, or in any of their arguments before us. On the contrary, they argued that, pursuant to the "clear and unambiguous" language of the account agreement, the bank's setoff right could not be exercised because the bankruptcy court had discharged the underlying debt. Therefore, the Coutures have not preserved this issue for our review. *See* Joseph R. Weisberger, *Rhode Island Appellate Practice* Rule 16.5 at 89 (1993) ("no issues may be raised on appeal unless such issues were presented to the trial court in such a posture as to alert the trial justice to the question being raised"). Accordingly, we have no occasion to consider whether this type of setoff provision in an account agreement may be so unclear, inconspicuous, or unconscionable that it should not be enforced against depositors like the Coutures. *See generally* Paul Laurino, *Whose Money is it Anyway? A Bank's Right to Setoff Against Joint Accounts,* 1996 Colum. Bus. L.Rev. 61, 62 (1996) (concluding that courts should be less generous in enforcing maximum setoff agreements, thereby encouraging banks "to make information about the various types of joint accounts more accessible and comprehensible to customers").

Indeed, because the Coutures have failed to raise this issue at any time, we are of the opinion that it would be inappropriate to remand this case to the Superior Court so that it can undertake an initial examination of this unraised and unargued issue and its ramifications. *See, e.g., Hig-*

*gins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 258, 259–61 (1st Cir.1999) (explaining that, although an appellate court reviews summary judgments on a *de novo* basis, it should not reverse such an order by relying upon arguments that the nonmoving party failed to raise before the trial court, let alone on appeal). Unlike the dissent, we prefer to wait until a party appropriately raises this potential defense, instead of unilaterally surfacing this issue on our own—on behalf of just one side to a controversy—when no party has briefed this question, argued this issue, or asked us to consider this point. As the dissent itself acknowledges, "the issue of the contract of adhesion was not raised in *Paradis*. There is no question that the holding in *Paradis*, save for the existence of an adhesion contract, would be controlling in the case at bar." But here too, as in *Paradis*, the issue of contract adhesion was not raised. Thus, *Paradis* controls and the setoff clause is valid and enforceable.

## II

### Effect of Bankruptcy on the Setoff Right

■ Having determined that, at the time of default, PCU had a contractual right to set off the debtor's mortgage loan deficiency against the funds in the accounts, we turn to the issue of whether the debtor's later bankruptcy affected this right.

Section 553(a) of 11 U.S.C., the Bankruptcy Code, preserves, protects, and limits setoff rights in bankruptcy cases, as follows:

"Except as otherwise provided in this section and in sections 362 and 363 of this title, *this title [bankruptcy] does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor* that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case." (Emphasis added.)

Under 11 U.S.C. § 553(a), federal bankruptcy law recognizes and preserves a creditor's setoff right when four conditions exist: "(1) the creditor holds a 'claim' against the debtor that arose before the commencement of the [bankruptcy] case; (2) the creditor owes a 'debt' to the debtor that also arose before the commencement of the case; (3) the claim and debt are 'mutual'; and (4) the claim and debt are each valid and enforceable." 5 Lawrence P. King, *Collier on Bankruptcy* ¶ 553.01[1] at 553–7 (15th rev. ed.2000).

In this case, we hold that PCU's setoff claim satisfied all the requirements of 11 U.S.C. § 553(a). PCU held a valid and enforceable claim[1] against debtor when debtor failed to make payments and defaulted on his mortgage loan in March 1996 (almost seven months before the filing of debtor's bankruptcy petition). According to the rules and regulations of the accounts, each of the several signatories possessed joint "ownership" of the accounts and each enjoyed the unilateral authority to withdraw all the funds therein without first obtaining the consent from any other signatory.[2] Thus, because debtor possessed an "ownership" interest in the accounts, PCU "owed" him and the Coutures the obligation to repay the amounts on deposit. Finally, because debtor possessed an "ownership" interest

---

1. A "claim" is defined by the code as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). A claim is considered to have arisen before the commencement of the debtor's bankruptcy if all the elements of liability arose before the filing of the bankruptcy petition. *See United States v. Gerth*, 991 F.2d 1428, 1433 (8th Cir.1993).

2. The rules and regulations provide as follows: "Ownership: Certificates in more than one name are payable to either or to the survivor."

in the accounts and was liable on the defaulted mortgage loan, "both obligations [were] held by the same parties, in the same capacity" and were therefore "mutual" when the debtor defaulted in repaying the mortgage loan. *In re Selma Apparel Corp.*, 155 B.R. 241, 243 (Bankr.S.D.Ala. 1992) (holding that even though the code does not define the term "mutual," "mutuality has been found [when] both obligations are held by the same parties, in the same capacity"). Accordingly, a debtor's bankruptcy "does not affect any right of a creditor to offset a mutual debt." 11 U.S.C. § 553(a). Hence, PCU was entitled to hold the funds in the accounts during the bankruptcy proceedings and to set off the mortgage-loan deficiency against these funds, notwithstanding the discharge of debtor's underlying mortgage-loan obligation in the bankruptcy.

## III

## Preservation of Setoff Right From Discharge

■ We also hold that, under 11 U.S.C. § 553 of the code, PCU was not required to file a proof of claim to protect its setoff right from discharge in bankruptcy. Neither § 553 nor any other provision of the code requires a creditor to file a proof of claim to protect its setoff right. On the contrary, 11 U.S.C. § 553(a) expressly provides that nothing in the code affects a creditor's right to exercise its setoff rights, except for §§ 362, 363 and § 553 itself (which make no mention of the need for filing any proofs of claim). Although 11 U.S.C. § 501(a) states that a creditor "*may* file a proof of claim," (emphasis added), its history confirms that this is not a mandatory provision:

> "This subsection [§ 501(a) ] is *permissive only*, and does not require filing of a proof of claim by any creditor. It permits filing where some purpose would be served, such as where a claim that appears on a list * * * was incorrectly stated or listed as disputed, contingent, or unliquidated, [or] where a

creditor with a lien is undersecured and asserts a claim for the balance of the debt owed him. * * * In other instances, such as in no-asset liquidation cases, * * * filing of a proof of claim may simply not be necessary." S.Rep. No. 95–989, at 61 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5847. (Emphasis added.)

Here, PCU would have been required to file a proof of claim only if it had wanted to share (to the extent of its deficiency claim) in any general unsecured assets remaining in the debtor's bankruptcy estate. But this Chapter 7 bankruptcy was a "no-asset liquidation case[ ]" in which no assets remained in the debtor's estate for distribution to unsecured creditors. Thus, "filing a proof of claim [would] simply not [have been] necessary" for a creditor like PCU because there would be no assets remaining in the debtor's estate from which a distribution could be made. Even assuming that debtor's bankruptcy had not been a "no-asset liquidation case[ ]," PCU's failure to file a proof of claim would have resulted only in the loss of its claim to a pro rata share of any assets remaining in the estate to which it was entitled as a general unsecured creditor—but *not* in the loss of its secured claim or setoff right.

■ And even though PCU's contractual setoff right "is not quite the same thing as a mortgage or a security interest. * * * [T]here is little to distinguish between a creditor's status [in a bankruptcy proceeding] arising from a right of setoff and its status arising from some other type of security entitlement." 4 Lawrence P. King, *Collier on Bankruptcy*, ¶ 506.03[1][b] at 506–17 (15th rev. ed.2000) (quoting *In re Elcona Homes Corp.*, 863 F.2d 483, 485 (7th Cir.1988) ("The only sense we can make of the rule is that it recognizes that the creditor who owes his debtor money is like a secured creditor; indeed, the mutual debts, to the extent equal, secure each party against the other's default.")). Indeed, a right of setoff has been described

as a "security of the most perfect kind." *In re Yale Express System, Inc.,* 362 F.2d 111, 114 (2d Cir.1966). As a result, courts have held that 11 U.S.C. § 553 takes precedence over § 524(a)(2) (the discharge provision) in a Chapter 7 case so that "a right of setoff * * * survives a discharge just as much as a claim secured by a mortgage or any other lien." *In re Thompson,* 182 B.R. 140, 154 (Bankr. E.D.Va.1995); *see also In re Buckenmaier,* 127 B.R. 233, 237 (B.A.P.9th Cir.1991) (holding that 11 U.S.C. § 553 takes precedence over § 524(a)(2) in Chapter 7 case); *Posey v. United States Department of the Treasury,* 156 B.R. 910, 915 (W.D.N.Y. 1993) (same); *In re Runnels,* 134 B.R. 562, 565 (Bankr.E.D.Tex.1991) (same).

The Tenth Circuit Federal Court of Appeals has followed this reasoning and held that "filing of a proof of claim is not a prerequisite to asserting a right to setoff under 11 U.S.C. § 553" and that "a discharged debt may be setoff upon compliance with the terms and conditions stated in section 553"—regardless of whether a proof of claim has been filed or not. *In re Davidovich,* 901 F.2d 1533, 1539 (10th Cir. 1990). Observing that "it would also 'be unfair to deny a creditor the right to recover an established obligation while requiring the creditor to fully satisfy a debt to a debtor,'" *id.,* the Tenth Circuit held that "a creditor's right to setoff was a universally recognized right grounded in principles of fairness that was not, with a few limited exceptions, affected by the Bankruptcy Code." *Id.*

Finally, we agree with the *Wiegand* court that by allowing PCU to exercise its setoff right "[t]he primary purpose of discharge in bankruptcy is not disserved." *In re Wiegand,* 199 B.R. at 642. "[T]he primary purpose of discharge is to prohibit post-bankruptcy debt collection." *Id.* As was the situation in *Wiegand,* the creditor in this case (PCU) is not seeking to collect a debt from debtor but rather "merely offset[ting] its obligation to [debtor] with that of [debtor's] to [PCU]." *Id.*

**Conclusion**

For the foregoing reasons, we conclude that PCU's right to set off the funds in the accounts against the debtor's unpaid mortgage-loan balance survived the debtor's discharge in bankruptcy. Thus, PCU was entitled to summary judgment as a matter of law. Accordingly, we sustain PCU's appeal, vacate the Superior Court's summary judgment in favor of the Coutures, and remand this case to the Superior Court for entry of summary judgment in favor of PCU.

WEISBERGER, Chief Justice, concurring and dissenting with whom Justice BOURCIER joins.

I concur with the majority with respect to their analysis of the Federal Bankruptcy Code as it may affect a creditor's right of setoff. I am in agreement that setoff is a matter of state law.

However, I think that we should be somewhat more skeptical of the right of a bank, by means of an adhesion contract, to seize the life savings of an elderly couple who made the mistake of placing their son's name on a joint account. *See Donatelli v. Fleet National Bank,* 692 A.2d 339, 340 (R.I.1997) (mem.) ("the general rule that joint bank accounts may be seized by creditors of one of the depositors is limited by the caveat that the creditor may reach only those funds in the account which the debtor depositor equitably owns") (citing *Joint Bank Account as Subject to Attachment, Garnishment, or Execution by Creditor of One of the Joint Depositors,* 11 A.L.R.3d 1465, 1473 (1967)).

It is true that the order in *Donatelli* distinguished our opinion in *Paradis v. Greater Providence Deposit Corp.,* 651 A.2d 738, 740 (R.I.1994), on the ground that *Paradis* involved a depository contract to which both the depositors and defendant bank were parties. *Donatelli,* 692 A.2d at 340. Indeed, that was true in the case at bar. However, the issue of the contract of adhesion was not raised in *Par-*

*adis.* There is no question that the holding in *Paradis,* save for the existence of an adhesion contract, would be controlling in the case at bar.

Nevertheless, on reflection, I am of the opinion that the draconian power of a bank or credit union to seize the life savings of parents, who may add the name of a son or daughter to an account to which he or she has contributed nothing, is a subject that should give us pause before blindly following the doctrine of *Paradis* in every case.

I believe that the general statement, quoted by the majority ("PCU may at its discretion, apply any or all of the funds represented by the certificate against any indebtedness in default which may be owing to it by the [account] holder as an offset against such debt"), does not necessarily give an adequate warning to parents of the disastrous results that may occur from their adding the name of a noncontributing child to their joint account. It would not be unduly harsh to require a bank to set forth in bold type that the indebtedness of any individual, who is a joint holder of an account, may be set off against the entire account, regardless of whether he or she has contributed anything to it.

Meanwhile, in the case at bar, I believe that the adequacy of the warning that was given by the setoff clause constitutes an issue of fact that should not be decided on summary judgment.

In the insurance context, we have considered the effects of contracts of adhesion. In *Pickering v. American Employers Insurance Co.,* 109 R.I. 143, 282 A.2d 584 (1971), we observed that "[a]n insurance contract is not the end result of the give-and-take that goes on at a bargaining table. * * * [A]n insurance policy is not a true consensual arrangement but one that is available to the premium-paying customer on a take-it-or-leave-it basis. This being the case * * * it is most appropriate that a carrier not be permitted to declare a forfeiture of * * * bargained-for protection unless there has been a breach of the notice provisions *and* the likelihood that the carrier has been prejudiced thereby." *Id.* at 159–60, 282 A.2d at 593 (citing *Cooper v. Government Employees Insurance Co.,* 51 N.J. 86, 237 A.2d 870 (1968)). (Emphasis added.) The United States Supreme Court has also considered the effects of contracts of adhesion. *See Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (Stevens, J., dissenting) ("Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all of the terms. In such a case the usual rule that the terms of the agreement are not to be questioned should be abandoned and the court should consider whether the terms of the contract are so unfair that enforcement should be withheld."). *Id.* at 600–01, 111 S.Ct. at 1531, 113 L.Ed.2d at 636 (quoting *Williams v. Walker–Thomas Furniture Co.,* 350 F.2d 445, 449–50 (D.C.Cir.1965)); *see generally* Friedrich Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract,* 43 Colum. L.Rev. 629, 632 (1943) ("Standard contracts are typically used by enterprises with strong bargaining power. The weaker party, in need of the goods or services, is frequently not in a position to shop around for better terms, either because the author of the standard contract has a monopoly (natural or artificial) or because all competitors use the same clauses. * * * Thus, the standardized contracts are frequently contracts of adhesion; they are *à prendre ou à laisser.*"). As the majority indicates, the bank has given itself a contractual right to allow any holder of joint account status to withdraw the entire sum. However, this would not, and indeed should not, prevent the parents from seeking equitable relief

to prevent such a withdrawal if such relief was sought before the withdrawal occurred.

Nevertheless, I believe we should take a closer look at the bank's relationship to the joint depositors in this instance. This case came to us based upon a summary judgment in favor of the plaintiffs. I believe that summary judgment was not an appropriate remedy. I would remand this case to the Superior Court for a determination of the precise contribution that the son made to this joint account and also to determine whether his name was placed on this account as a matter of convenience.

We have held that a joint account may be utilized as a means of bestowing a right of survivorship upon a child or other family member without the hindrance of the requirement of the statute of wills. *See Robinson v. Delfino,* 710 A.2d 154, 161 (R.I.1998) ("the opening of a joint bank account wherein survivorship rights are specifically provided for is conclusive evidence of the intention to transfer to the survivor an immediate *in praesenti* joint beneficial possessory ownership right in the balance of the account remaining after the death of the depositor, absent evidence of fraud, undue influence, duress, or lack of mental capacity"). We have never held that there may not be equitable restraints upon a person whose name is on a joint account but who has contributed nothing to it to withdraw the entire sum or any portion without the permission of the donors. I do not contend that such an individual would be inhibited from withdrawing the entire sum from the bank or credit union without any liability on behalf of the bank or credit union.

However, I do not consider it at all impossible for the donors to seek equitable relief to avoid such a withdrawal before it has actually taken place, as sometimes occurs in a family law context. Consequently, I am of the opinion that the credit union should be subject to the equitable defenses of the parents against the credit union's right of setoff, the contract of adhesion to the contrary notwithstanding. Little or no warning may have been given to depositors who added a noncontributing member to their joint account. They certainly took the chance that the noncontributing member would withdraw the funds without their permission and that the bank would not be liable therefor. However, I believe it is a significant question of fact, concerning whether they were adequately warned in a situation, such as presented in the case at bar, that their son's indebtedness might be setoff against them without ceremony or even consideration to their supervening equitable interest in the account.

I would remand this case to the Superior Court for a trial on the merits to determine what, if any, contribution the son made to this account, and whether the credit union had warned, in decisive terms, the mother and father of their potential liability in respect to the son's indebtedness. In the event that the son made no contribution, and in the event that no specific warning other than boilerplate language was given to the elder Coutures, I would deny the right of setoff on equitable grounds. My concern for the credit union and its financial integrity is not sufficiently great to prevent the plaintiffs in this case from presenting equitable defenses to this right of setoff, in the same manner that they might present them in litigation with their son if they sought to prevent his withdrawing the entire deposit or some portion thereof, or against another creditor, as in *Donatelli, supra.*